DECISION
This matter is before the court for decision after a jury waived trial.
At the time of the initiation of the events in controversy, plaintiff, Attorney Paul E. Burke, d/b/a/ Property Tax Abatement Associates Inc., entered into an agreement with defendant Foundation (NRF) whereby plaintiff was to seek a reduction and/or refund of defendant's property taxes. That agreement, dated May 1, 1990, was "accepted" by PTAA and NRF whose signatories were William Cunningham and Benjamin C. Reed, Jr. respectively. The agreement was extended in writing on April 4, 1991, and was signed this time by Mr. Burke on behalf of PTAA (and again by Mr. Reed for NRF). Another extension issued on June 5, 1991 and was signed by the same representatives as in the original contract.
Defendant contends that the contract is null and void as violative of public policy and statutory law.
On March 2, 1994, Mr. Burke signed a "Settlement Agreement and General Release" obligating NRF to pay him $150,000 for his services in order to "amicably resolve" disputes and claims which had arisen in the parties' relationship. Plaintiff was paid that sum but persists that the release is unenforceable. Plaintiff contends that even if the release is recognized as valid, he remains entitled to additional sums for appeal work and for efforts expended with reference to the Samuel Whitehorn Museum.
Attorney Paul E. Burke testified that he has been practicing law in Rhode Island since 1963 and unfortunately he was compelled to retire in August of 1995 due to suffering two strokes. He explained that he has some residual paralysis and that sometimes his memory is "a little shot." One would not guess this from observing Mr. Burke as he appears healthy and lucid. His demeanor was intelligent and very gentlemanly.
Mr. Burke testified that he became interested in tax abatement around 1990 after his family practice had waned due to the closure of the Legal Aid Society. Evidently, Mr. Burke's son Michael, who is an attorney in Massachusetts, mentioned this idea to his dad. In 1990, Mr. Burke maintained a law office at 419 Thames Street in Newport. He had filed incorporation papers for PTAA but did not complete them, resulting in "forfeiture" in 1991.
Mr. William Cunningham, a tenant in the same building as defendant, was informed by the plaintiff that he (the plaintiff) was "looking for places paying a large tax bill." Mr. Cunningham then brought Mr. Burke to defendant's office building where they met Ronni Perry, the defendant's secretary who arranged for Mr. Burke to meet with Benjamin Reed, defendant's principal. Mr. Reed's reaction was that plaintiff's proposal "sounded good" but he could not make a commitment without the input and approval of Irwin Bloom, defendant's accountant.
At trial, Mr. Burke indicated that he had quarreled with Mr. Bloom who rejected plaintiffs proposed fee of 50% of the tax money saved. Mr. Bloom countered 35% of the savings with Mr. Burke paying all expenses. When Mr. Burke requested an advance for the cost of appraisals on 60 properties, Mr. Bloom responded, "we only pay for results." Plaintiff later prepared the fee agreement (Ex. 1) and had William Cunningham bring it to NRF office for a signature. Mr. Cunningham was described as an individual who "hung around" the office and performed errands and answered the phone from time to time, without compensation.
At the time that the tax assessment was appealed, Mr. Burke engaged Attorney William Corcoran to do the trial work. Mr. Corcoran's eventual bill for his involvement in the matter was $7,167.89. (Ex. 33). At the time of trial, defendant's attorney, Arthur Murphy advised that he represented NRF and that they wished the case to be withdrawn and dismissed. From February 1993 to the dismissal in March, 195, Mr. Burke testified that he spent "probably 10 hours" on the matter, "mostly coming here [Newport Superior Court] for calendar calls." Later Mr. Burke testified that he worked a total of 145 hours a the rate of $150.00 per hour but that he maintained no written time records.
With reference to the Samuel Whitehorn Museum, Mr. Burke indicated that it was not on the tax rolls when he started working on NRF's behalf. After the revaluation, it appeared on the tax roster and Mr. Reed asked Mr. Burke to work to have the museum restored to its previous tax exempt status.
At the time the release was signed, the museum was not an issue and therefore, plaintiff asserts, could not have been embraced by the agreement.
Attorney Joseph T. Houlihan testified that it was he who negotiated the settlement of the fee dispute between plaintiff and defendant. The documentary evidence reveals that plaintiff's position was that since the appraisal reduction it obtained would save taxes from 1992 through 2002, plaintiff was entitled to 35% of all taxes abated including "prior, present, and perspective [sic] taxes assessed and/or to be assessed." (Ex. 24) The same letter, addressed to NRF's Chicago counsel expressed the willingness of plaintiff to compromise in order to continue its' relationship with NRF. The desire to continue the relationship was reiterated in Attorney Houlihan's letter of January 10, 1994 in which he offered to settle for $180,000 which represented one half of the amount due. (Ex. 25.) The letter noted that the offer was a substantial compromise and constituted an aberration from PTAA's standard arrangement with clients. Mr. Houlihan's last offer of compromise issued on January 27, 1994 in a letter, again to Chicago counsel, wherein he states, "as one last attempt to resolve this matter, my clients have agreed to come down to $150,000 plus reimbursement of fees. . . ."
The plaintiff acknowledges that he freely signed the release with a full understanding of its contents but thought that it was conditioned upon his pursuit of the Superior Court appeals (which would produce additional income to him). When the appeals were dismissed, Mr. Burke, according to Mr. Corcoran's testimony, was "understandably upset." It cannot be gainsaid that a decision to end litigation and settle or dismiss a case is exclusively the province of one's client. The attorney's duty is to advise, counsel, present options and discuss possible outcomes based upon alternative strategies. After such counsel, when the client makes a choice, that choice must be honored and enforced by the attorney without hesitation. When an attorney of over three decades of experience signs a release relating to a fee dispute, the court is very hard-pressed to go without the release to discern intention or to, in essence, add provisions. Additionally, the attorney had another attorney negotiate the settlement for him. It is clear in the correspondence predating the release that prospective earnings were in controversy. Yet, the release, which is clear and unambiguous on its face, does not reference them.
The credible evidence, the status of the parties and the description of events culminating in the release compels the court to the conclusion that the release is valid and must be recognized and enforced. The $150,000 sum which has been paid to Mr. Burke which was clearly the product of negotiation, represents a discharge of defendant's obligations per the release.
There is not sufficient evidence before the court to rule, as defendant urges, that the fee agreement is void and/or against public policy or contrary to RIGL 11-27-8. In any event, since the court has ruled that the release must be honored, the issue is moot.
With reference to the museum, the plaintiff cannot have it both ways; i.e., that it could not have been the subject matter of the release, yet defendant is responsible to pay him per the original fee agreement. That agreement speaks of reductions, abatements and refunds of taxes on properties which are properly taxed, but overvalued. The issue with the museum was its status, as a potentially tax exempt entity. The documentary evidence reveals that Mr. Burke expended time and effort in successfully returning the museum to its previous status. His reimbursement, however, cannot be controlled by the original agreement because that property was neither identified nor contemplated as one of the subjects for which abatement was to be sought.
Mr. Burke is clearly entitled to be compensated for his work with reference to the museum on a quantum meruit theory. Although there is evidence in the record that a reasonable rate of compensation at the applicable time was $150.00/hour, the court could not locate (in its notes) testimony concerning the number of hours Mr. Burke expended on the museum. The court will permit the plaintiff, if he is so inclined, to present evidence — on that item only — at a damages hearing.
Counsel shall prepare the appropriate order for entry.